Filed 5/21/26  P. v. Ruiz CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ARMANDO GARCIA RUIZ,<br><br>    Defendant and Appellant. | B335973<br><br>(Los Angeles County<br>Super. Ct. No. BA483209) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Shelly Torrealba, Judge.  Affirmed with directions.

Patricia S. Lai, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Armando Garcia Ruiz of one count of second degree murder (Pen. Code, § 187, subd. (a))[1] and one count of false imprisonment (§ 236) after Garcia Ruiz fatally shot Skye Gutierrez during a confrontation over stolen marijuana. Garcia Ruiz argues we should reverse because the trial court failed to instruct the jury that his youth was a relevant factor in determining whether he acted with conscious disregard to human life in killing Gutierrez. He also argues the court applied the wrong standard in denying his motion to strike a firearm enhancement for purposes of sentencing, that the court should have stayed his sentence for false imprisonment under section 654, and that we must correct an error in the abstract of judgment. Finally, he requests that we review the record to determine whether the trial court erred in denying his request for a copy of the video recording of *Perkins*[2] operations in which an undercover agent spoke with him and with a codefendant in jail.

We agree with Garcia Ruiz as to the abstract of judgment. Otherwise, we find no prejudicial error by the trial court, including in its denial of the motion to turn over the recording of the *Perkins* operations. We therefore affirm the judgment subject to the change in the abstract of judgment.

## FACTS AND PROCEEDINGS BELOW

Garcia Ruiz supplied marijuana, pills, and other products to subordinates including Matthew Reyes and Elizabeth Zuniga,

---

[1] Unless otherwise specified, subsequent statutory references are to the Penal Code.

[2] *Illinois v. Perkins* (1990) 496 U.S. 292 [110 S.Ct. 2394, 110 L.Ed.2d 243] (*Perkins*).

who in turn sold the drugs to customers. Reyes was Garcia Ruiz's codefendant but reached a plea agreement prior to trial. Zuniga testified against Garcia Ruiz.

The chain of events that led to Gutierrez's killing began on the morning of November 17, 2019, when Reyes was robbed of a backpack full of marijuana and some electronics. Zuniga testified as to what Reyes told her about the robbery, which was that Reyes had met with Gutierrez to sell her drugs. While Gutierrez sat in the front seat of Reyes's car and distracted him, Gutierrez's companion Fernando Jackson entered the back seat of the car, put a knife to Reyes's neck, and took his backpack. Surveillance video footage and cellular phone data generally corroborated this account.

Garcia Ruiz became angry when he learned about the robbery. According to Zuniga, Garcia Ruiz was upset at the loss of the marijuana but was more concerned that Gutierrez and Jackson had disrespected him. He enlisted Zuniga to message Gutierrez asking to buy drugs from her, hoping to set up a meeting where they could recover the backpack. Garcia Ruiz believed Gutierrez was more likely to respond to Zuniga because she was a woman.

In the end, Zuniga primarily spoke with Jackson rather than Gutierrez. Over the course of the day, she made or received about 32 phone calls with him. Gutierrez's friend Jasmine Melendez testified she was with Gutierrez and Jackson that afternoon and overheard some of the calls. She characterized the conversations as "very aggressive," and she heard some talk regarding the possibility of a fight or gun violence.

Initially, Zuniga tried to arrange to meet with Jackson and Gutierrez in a local park, but Jackson left the area before the

3

meeting took place.  Garcia Ruiz and Reyes then went to stake out the area around Jackson's apartment, near where the robbery took place.  In the evening, Zuniga texted Garcia Ruiz that Gutierrez "already knows y'all lookin for them."  Garcia Ruiz replied, "It's all good tho.  They can run but can't hide."  Garcia Ruiz and Reyes returned home later that night after failing to find Jackson and Gutierrez.  Zuniga later told police she was fairly certain that neither Garcia Ruiz nor Reyes intended for anyone to die, but she saw a handgun on Garcia Ruiz's lap as she rode in his car that afternoon.

The next day, Garcia Ruiz continued searching for Jackson and Gutierrez.  Cell phone location data showed that the three were all located near the same shopping mall at about 9:39 p.m., and that they all left shortly afterward.

Surveillance videos from cameras at nearby homes recorded the scene a few minutes later outside Jackson's apartment.  First, Garcia Ruiz and Reyes arrived in a white minivan at about 10:10 p.m. and parked on the street.  Jackson and Gutierrez followed about 30 seconds later in a black BMW, which they parked on the opposite side of the street.

Gutierrez got out of the BMW and walked around the front of the vehicle, at which point Garcia Ruiz and Reyes got out of the minivan.  Garcia Ruiz ran toward Gutierrez, and Reyes ran toward the passenger seat of the BMW, where Jackson was seated.  Reyes was carrying a baseball bat, which he swung at the windshield of the BMW.  Jackson got out of the BMW, and Reyes swung the baseball bat at him.  The bat clanged to the ground, and Reyes and Jackson wrestled on the grassy area next to the passenger side of the car.

4

As Reyes ran toward Jackson, Garcia Ruiz approached Gutierrez. The resolution of the surveillance video is too low to depict clearly what was in Garcia Ruiz's hand, but he held his arm out in front of his body as if pointing a gun. When Garcia Ruiz reached Gutierrez, he grabbed her from behind and pulled her toward the trunk of the car near where Reyes and Jackson were fighting. One of the surveillance cameras recorded audio of the encounter. It recorded Garcia Ruiz saying, "Hey, hey, hey, don't even move," and "You move, I'm a [*sic*] do her." Reyes and Jackson continued wrestling, and Garcia Ruiz pulled Gutierrez backwards with him away from the fighting. A few seconds later, a gunshot rang out,[3] and Gutierrez slumped to the ground. Garcia Ruiz ran back to the front passenger's seat of the minivan. A few seconds later, Reyes separated himself from Jackson and followed. Reyes got into the driver's seat and drove away.

Gutierrez was pronounced dead at a local hospital. A medical examiner testified that the cause of death was a gunshot wound to the back of the neck. The presence of soot around the entrance wound indicated that Gutierrez was shot at close range, though the medical examiner did not see a muzzle imprint that might have been present if the gun had been pressed up against her neck. Gutierrez did not have defensive injuries to her hands or fingernails.

Police arrested Garcia Ruiz about three weeks later, and two detectives interviewed him about the crime. At first, Garcia

---

[3] A row of trees separated the home where the closest surveillance camera was located from the street. As a result, the video footage shows only the lower part of Garcia Ruiz and Gutierrez's bodies, and it does not show the fatal shot.

Ruiz denied involvement and gave no substantive answers, but eventually, he acknowledged being involved. He denied that he intended to shoot Gutierrez, claiming the gun went off accidentally because she was "pulling" away from him and getting "aggressive," and "with her hand kind of elbowed me." Later, he said that Gutierrez was grabbing at his hand that was holding the gun, and as they were wrestling, he heard the gun go off.

Garcia Ruiz did not testify in his own defense, but he called a firearms expert, who testified that the trigger pull of a revolver required between 12 and 15 pounds of force. The expert could not determine the type of gun used in the shooting, but he testified that a gun can discharge accidentally either because of a mechanical malfunction or negligent handling.

The prosecution charged Garcia Ruiz with one count of first degree murder (§ 187, subd. (a)) and one count of kidnapping for ransom (§ 209, subd. (a)). The prosecution also alleged that Garcia Ruiz personally and intentionally discharged a firearm causing great bodily injury and death. (§ 12022.53, subd. (d).) The jury convicted Garcia Ruiz of lesser versions of both counts, finding him guilty of second degree murder and false imprisonment by violence (§ 236). In addition, the jury found true a lesser firearm allegation, finding that he personally used a firearm (§ 12022.53, subd. (b)) in the commission of the murder. The trial court sentenced him to 15 years to life in prison for murder, plus an additional 10 years for the firearm enhancement. The court imposed a two-year sentence for false imprisonment by violence but ordered that it be served concurrently.

6

## DISCUSSION

### A. Any Error in the Trial Court's Failure to Instruct the Jury Regarding Garcia Ruiz's Youth as a Factor in the Mental State for Second Degree Murder Was Harmless

Garcia Ruiz argues the trial court erred by failing to include, in its jury instructions on implied-malice second degree murder, a statement that the jury could consider his youth as a relevant factor in determining whether he acted with reckless indifference to human life. He acknowledges he did not request such an instruction before the trial court, but he argues we should either excuse the forfeiture or find his attorney rendered ineffective assistance of counsel by failing to request such an instruction. We need not decide whether the court was required to instruct the jury on his youth because any error in failing to do so was harmless. Garcia Ruiz's claim of ineffective assistance of counsel also fails because he has not shown prejudice.

Because no case has held that a trial court must instruct the jury on the defendant's youth as a relevant factor in implied malice murder, Garcia Ruiz relies primarily on a case addressing this issue in a different context. In *People v. Pittman* (2023) 96 Cal.App.5th 400 (*Pittman*), the court held that in deciding a resentencing petition under section 1172.6, the trial court must "consider how, if at all, [the defendant's] youth impacted his ability to form the requisite mental state for second degree murder." (*Pittman, supra,* at p. 418.)

To be guilty of implied-malice second degree murder, a defendant must " ' " ' "know[] that his conduct endangers the life of another," ' " ' " and must " ' " ' "act[] with conscious disregard for life." ' " ' " (*Pittman, supra,* 96 Cal.App.5th at p. 414.) In a

7

case like *Pittman*, where the defendant was convicted as an aider and abettor, the defendant must "act with intent to aid the life-endangering act of the direct perpetrator that proximately causes the death" (*id.* at p. 415) while " ' "know[ing] that the act is dangerous to human life, and acting in conscious disregard for human life" ' " (*ibid.*, italics omitted, quoting *People v. Reyes* (2023) 14 Cal.5th 981, 991). The court in *Pittman* concluded that the defendant's youth was relevant to such a determination because of "youthful offenders' 'relative impulsivity' and 'their vulnerability to peer pressure.' [Citation.] ' "[T]ransient rashness," ' ' " 'impetuosity,' " ' and ' " 'failure to appreciate risks and consequences' " ' are hallmarks of an immature brain." (*Pittman*, *supra*, 96 Cal.App.5th at p. 418.)

We have serious doubts as to whether the *Pittman* court's reasoning translates to the context of this case. By definition, defendants eligible for resentencing under section 1172.6 did not personally kill their victims. Instead, they were convicted of murder for participating in criminal activity during which a cohort killed a victim and had malice imputed to them. (See *People v. Gentile* (2020) 10 Cal.5th 830, 842; § 1172.6, subd. (a).) The law at the time of their convictions allowed for murder liability on the basis of vicarious liability without regard to a defendant's personal culpability for the killing. (*Gentile*, *supra*, at pp. 843-844.) That is no longer the case, and in proceedings under section 1172.6, a defendant is entitled to resentencing unless "the prosecution can prove the defendant acted with the accompanying mental state of mind of malice aforethought." (*Gentile*, *supra*, at p. 846.) In such cases, it is natural to take a defendant's youth into consideration when deciding whether he understood the risks and consequences of his actions. That logic

8

has less force in cases like this one where the defendant literally pulled the trigger and fired the fatal gunshot. It is not at all obvious that a blanket rule requiring the trial court to instruct on the relevance of youth is warranted in all cases in which a young defendant is accused of personally committing implied-malice murder.

We need not decide whether and in what circumstances a trial court must instruct the jury on the defendant's youth, however, because in this case, any error in failing to give such an instruction was harmless.[4]  The circumstances of this case differ dramatically from those of *Pittman*.  Pittman, who was 21 at the time, noticed the victim using drugs with a prostitute in a truck in front of his house and said to two friends, " 'Let's go whip his ass.' " (*Pittman, supra*, 96 Cal.App.5th at p. 404.)  He saw some sharp chisels in a bucket nearby and handed them out to his friends.  One of the friends raced ahead, opened the door to the truck, and used his chisel to stab the victim.  (*Id.* at p. 405.)  There was conflicting testimony regarding Pittman's role in the attack, but at most he kicked or stomped on the victim after the killer pulled him out of the truck.  (*Id.* at p. 415.)

The court noted several indications suggesting youthful immaturity may have played a role in these events: "Pittman, 21, participated in the attack on [the victim] with two peers who were 16 and 17 years old.  Inferences of immaturity and peer

---

[4] Garcia Ruiz concedes that any error would be a matter of state law, and that we apply the *People v. Watson* (1956) 46 Cal.2d 818 standard in reviewing for harmless error.  We assume this is correct, as Garcia Ruiz does not allege the jury instructions omitted or misstated an element of the offense.  (See *People v. Hendrix* (2022) 13 Cal.5th 933, 942-943.)

9

pressure may be drawn from those facts. In addition, notwithstanding Pittman's characterization of the attack as 'planned,' the trial evidence indicates that Pittman and his peers acted impulsively and under the influence of 'transient rashness.' The selection of chisels as weapons appears to have been spontaneous. The acknowledged motivation for the crime was the happenstance that, while walking by his house, Pittman noticed [the victim] 'shooting up dope with a prostitute in his truck.' " (*Pittman, supra,* 96 Cal.App.5th at p. 418.)

The only common factor between this case and *Pittman* is the defendant's age. The killing of Gutierrez resulted from a business dispute. Garcia Ruiz did not act spontaneously, but instead devised a plan to find Gutierrez and Jackson, whom he tracked methodically over two days. Garcia Ruiz brought a gun with him during both days of his search, rather than simply grabbing whatever improvised weapons lay at hand. Most importantly, Garcia Ruiz was not an aider and abettor, but personally killed Gutierrez. We recognize the jury here found that shooting Gutierrez at close range after tracking her was not sufficient to convict Garcia Ruiz of first degree premeditated murder, but even so, "[p]ulling the hammer back on a loaded gun and pointing it at another is certainly evidence of an intentional act performed with conscious disregard for human life." (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1273-1274.) At minimum, Garcia Ruiz grabbed Gutierrez, pointed a loaded gun at her in the midst of a fight with his finger on the trigger, and threatened to shoot her if Jackson did not stop fighting with Reyes before he did in fact shoot her.

In sum, an instruction on the relevance of Garcia Ruiz's youth would have made no appreciable difference in the case as

10

there was no dispute Garcia Ruiz was the actual killer and the evidence of implied malice was overwhelming. Because it is not "reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error" (*People v. Watson*, *supra*, 46 Cal.2d at p. 836), any error in the failure to instruct the jury was harmless. (See *Pittman*, *supra*, 96 Cal.App.5th at pp. 417-418.)

Garcia Ruiz's claim of ineffective assistance of counsel fails for the same reason. To succeed on such a claim, a defendant must show not only that his attorney was negligent, but also "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 80 L.Ed.2d 674].) Garcia Ruiz has not met that standard here as there is no reasonable probability the result would have been different had defense counsel requested the instruction at issue.

## B. The Trial Court Did Not Abuse its Discretion by Imposing the Firearm Enhancement

Prior to his sentencing hearing, Garcia Ruiz filed a sentencing memorandum requesting the trial court stay or strike the 10-year enhancement for using a firearm in the murder (§ 12022.53, subd. (b)). He argued that two mitigating circumstances specified in section 1385, subdivision (c)(2) applied: "[t]he application of [the] enhancement could result in a sentence of over 20 years" (*id.*, subd. (c)(2)(C)), and "[t]he current offense is connected to prior victimization or childhood trauma" (*id.*, subd. (c)(2)(E)). In support of the latter claim, Garcia Ruiz submitted a report from a social worker detailing his history of trauma, including the presence of an alcoholic father who

physically abused his mother, as well as an experience as a teenager in which he was kidnapped for eight hours and robbed.

The trial court must "consider and afford great weight to evidence" of these mitigating circumstances, the presence of which "weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(2); accord, *People v. Walker* (2024) 16 Cal.5th 1024, 1029-1030.) Garcia Ruiz argued that the dismissal of his firearm enhancement would not endanger public safety because he had no prior criminal history and because even without the enhancement, he would need to serve 15 years in prison before even being considered for parole.

The trial court rejected Garcia Ruiz's request to strike the enhancement, finding that "in the totality of all of the circumstances and in considering the information that was provided to this court regarding your background, it doesn't outweigh or would it serve in the interest of justice to strike that enhancement because you do pose a serious danger to the community." Garcia Ruiz's disproportionate reaction to the theft of the backpack suggested that "a very minor situation" could "trigger [him] to act in a way that poses a danger to the community."

We review a trial court's decision to impose a sentence enhancement for abuse of discretion. (*People v. Gonzalez* (2024) 103 Cal.App.5th 215, 225.) " '[A]n abuse of discretion arises if the trial court based its decision on impermissible factors . . . or on an incorrect legal standard.' " (*Ibid.*, quoting *People v. Knoller* (2007) 41 Cal.4th 139, 156.) The issue of a defendant's dangerousness "is necessarily a forward-looking inquiry. When determining whether resentencing poses an unreasonable risk of

danger, the trial court must look to when a defendant would be released." (*People v. Williams* (2018) 19 Cal.App.5th 1057, 1063.) In *Gonzalez*, the court held that the trial court applied an incorrect standard by focusing only on whether the defendant currently posed a danger to the public, without taking into account whether he would continue to do so on the date of his release. (*Gonzalez*, *supra*, at pp. 230-231.)

Garcia Ruiz argues the trial court in this case made the same error as in *Gonzalez*, and that we must remand the case for a new sentencing hearing. We disagree. The record in *Gonzalez* showed that the court expressly declined to consider the defendant's dangerousness as of the date of release and focused exclusively on dangerousness at the time of sentencing. (*People v. Gonzalez*, *supra*, 103 Cal.App.5th at pp. 223-224.) In contrast, the record in this case does not show the trial court focused solely on Garcia Ruiz's current dangerousness.

The trial court mentioned the issue of dangerousness only briefly during the sentencing hearing, stating it would not "serve in the interest of justice to strike [the firearm] enhancement because you do pose a serious danger to the community." *Gonzalez* affirmed that "the current dangerousness of the defendant is an appropriate factor to consider, as it will have some bearing on whether dismissing the enhancement would endanger the public." (*People v. Gonzalez*, *supra*, 103 Cal.App.5th at p. 228.) The court's failure to explicitly state that it was considering Garcia Ruiz's potential dangerousness at the time of his release does not show the court ignored that part of the law. In the absence of any evidence that the court misunderstood its obligations or the scope of its discretion, we

13

presume the court knew the applicable law and followed it. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042.)

## C. Substantial Evidence Supported the Trial Court's Decision not to Apply Section 654

Garcia Ruiz contends the trial court erred by failing to stay the sentence for false imprisonment under section 654 instead of imposing a concurrent sentence on that count. Section 654 bars multiple punishment for a single "act or omission" (*ibid.*), but courts have interpreted that term broadly to refer to "not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) Garcia Ruiz argues the murder and false imprisonment both arose from the same intent and objective.

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) "In the absence of any reference to . . . section 654 during sentencing, the fact that the court did not stay the sentence on any count is generally deemed to reflect an implicit determination that each crime had a separate objective." (*People v. Tarris* (2009) 180 Cal.App.4th 612, 626.)

The record contains almost no discussion of the application of section 654 to Garcia Ruiz's convictions. Garcia Ruiz filed a sentencing memorandum requesting that the court stay his

14

sentence for false imprisonment pursuant to section 654, but he offered no reasoned argument in support of any claim that his offenses arose from the same objective or course of conduct. The People's sentencing memorandum likewise addressed the issue in a conclusory manner. The People stated only that they did "not agree" with Garcia Ruiz's position, but that they "would not object to [his] sentence being stayed for this count." At the sentencing hearing, neither the court nor the parties discussed the issue. The court stated that it would "impose a concurrent principal term of two years" for false imprisonment, and did not refer explicitly to section 654.

Based on this record, we must infer the trial court found Garcia Ruiz had a separate objective for each offense, and we review that implied finding for substantial evidence. (*People v. Tarris, supra*, 180 Cal.App.4th at p. 626.) We see no basis for reversing the trial court under that standard. Although the two offenses occurred in quick succession and were part of the same dispute, they were not encompassed in the same physical act because no single action "complete[d] the actus reus for each of the relevant criminal offenses." (*People v. Corpening, supra*, 2 Cal.5th at p. 313.) Furthermore, the trial court could reasonably find that Garcia Ruiz committed each offense for a separate purpose. For example, the court could have found that Garcia Ruiz initially grabbed Gutierrez as part of a plan to recover the stolen backpack, but that he shot her for revenge—the prosecution presented evidence that both of those purposes motivated Garcia Ruiz. On this mostly silent record, where we must "review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence"

15

(*People v. Jones*, *supra*, 103 Cal.App.4th at p. 1143), we do not find error.

## D. The Trial Court Did Not Err by Denying the Motion to Disclose Videos of the *Perkins* Operations

In the course of their investigation, the police conducted separate *Perkins* operations on Garcia Ruiz and Reyes, in which they placed each defendant in a cell with an informant in the hope of eliciting incriminating information. The prosecution disclosed audio recordings and transcripts of the interviews but withheld video recordings of the interviews.

The court initially denied Garcia Ruiz's motion to disclose the video recordings on the ground that to do so would risk revealing the identity of the informant. "Evidence Code section 1040, subdivision (b)(2), authorizes the trial court to decline to disclose confidential records maintained by a public entity when it finds the 'necessity for preserving the confidentiality of the information . . . outweighs the necessity for disclosure in the interest of justice.' " (*People v. Landry* (2016) 2 Cal.5th 52, 73.) The court later modified its decision and allowed Garcia Ruiz's attorney to view the recordings in the presence of a police officer, but not to make copies of the recordings.

Because the transcript of the hearing during which the court interviewed a police officer regarding the *Perkins* operations is sealed, Garcia Ruiz's appellate attorney has asked us to review the transcript to determine whether the court abused its discretion by denying trial counsel's request for a copy of the recordings. In the context of a defendant's motion for disclosure of police personnel records—another context in which trial courts conduct in-camera hearings outside the presence of defense counsel—courts "routinely independently examine[ ] the

16

sealed records of such in-camera hearings to determine whether the trial court abused its discretion in denying a defendant's motion." (*People v. Prince* (2007) 40 Cal.4th 1179, 1285.) We see no reason not to review the trial court's decision on the *Perkins* transcript in the same manner. We have therefore reviewed the sealed transcript, and we find no prejudicial error by the trial court in denying the motion.

**E.    The Abstract of Judgment Must be Corrected**

The abstract of judgment states, correctly, that Garcia Ruiz was convicted of violating section 236, but it incorrectly describes this crime as "[k]idnapping for [r]ansom [r]esulting in [b]odily [h]arm or [d]eath." Section 236 actually refers to the crime of false imprisonment, and it was this offense for which Garcia Ruiz was convicted in count 3.

"An abstract of judgment is not the judgment of conviction," and it is important for courts to correct elements of an abstract of judgment that differ from the court's oral judgment." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Garcia Ruiz requests that we order the trial court to modify the abstract of judgment to list the correct crime in count 3. The People agree this is appropriate, as do we. (See *id.* at pp. 186-188.)

## DISPOSITION

The judgment of the trial court is affirmed.  On remand, the trial court shall amend the abstract of judgment as to count 3 to state that Garcia Ruiz was convicted of false imprisonment, and forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

M. KIM, J.